IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DONAVAN KROSKA-FLYNN,

                Plaintiff,                OPINION AND ORDER

  v.

                                                       18-cv-304-wmc

REED RICHARDSON
and JAMIE BARKER,

                Defendants.

This court previously granted *pro se* plaintiff Donovan Kroska-Flynn leave to proceed under 42 U.S.C. § 1983 on Eighth Amendment claims against two employees of Stanley Correctional Institution ("Stanley"), Jamie Barker and Reed Richardson, for their alleged deliberate indifference to his reports of various symptoms caused by Candida, a fungal infection. Kroska-Flynn has filed motions for preliminary injunction (dkt. ##27, 38), to compel (dkt. #47), to amend his complaint (dkt. ##48-49) and for assistance in recruiting counsel (dkt. #42). While the court will require defendants to supplement their response to Kroska-Flynn's assertions regarding the existence of certain video footage, the court will deny the balance of Kroska-Flynn's motions for the reasons set forth below.

OPINION

I.  Motion for Preliminary Injunction (dkt. ##27, 38)

    A.  Undisputed Facts[1]

Much of the undisputed record relevant to plaintiff's motion for a preliminary injunction concerns evidence of his *not* testing positive for various diseases. For example, in 2017, while incarcerated at Stanley, Kroska-Flynn underwent numerous blood tests, all of which were normal. Additionally, he provided a stool sample to test for parasites, which was normal. On July 28, 2017, Kroska-Flynn also underwent an MRI of his brain, which showed no signs of a stroke or tumor, nor was there a report of any inflammatory response.

Shortly after Kroska-Flynn was released from Stanley on June 26, 2018, he also attended several appointments at Essential Health in Duluth, Minnesota. Those records similarly do *not* show that Kroska-Flynn was diagnosed with meningitis. Instead, on July 19, 2018, a family doctor recommended testing for an infection or inflammatory response. However, Kroska-Flynn declined that testing; instead, he asked for something to "wash it away." On August 29, 2018, Kroska-Flynn had a follow-up visit, and the record of that visit also showed no signs or symptoms of a fungal infection. Kroska-Flynn was revoked and reincarcerated in September of 2018.

Kroska-Flynn next attests that in September of 2019, Dr. Cheryl Jean-Pierre ordered a trial of fluconazole and said that she would schedule an appointment with an infectious disease specialist for four months. (Kroska-Flynn Decl. (dkt. #29) ¶ 2.) However, Dr.

---

[1] Except where noted, the court draws the following, undisputed facts from Kroska-Flynn's declaration in support of his motion for preliminary injunction and defendants' evidence in opposition.

2

Jean-Pierre's notes from that encounter include neither a recommendation for him to see an infectious disease specialist, nor any order for such an appointment. (*See* dkt. #29-2, at 1.) In response, Kroska-Flynn asserts that Dr. Jean-Pierre's notes must have been doctored to omit her recommendation, since in the "Assessment/Plan" section of her notes includes an unfinished sentence starting with "He'll need the." (*Id.*)

In any event, Kroska-Flynn says that the fluconazole prescribed by Dr. Jean-Pierre alleviated the itch inside his head, the abnormal sensations in his body, and the rash. (*Id.* ¶ 5.) Dr. Hoffman also attests that fluconazole would treat a fungal skin infection, but it would not treat meningitis caused by a fungus. (Hoffman Decl. (dkt. #33) ¶ 17.)

In September 2019, Kroska-Flynn was transferred to the New Lisbon Correctional Institution ("New Lisbon"), where he was seen by Dr. Hoffman multiple times to address his belief that he was suffering from fungal meningitis. However, Dr. Hoffman did not schedule him for a follow up with an infectious disease specialist, and instead referred him to the Psychological Services Unit ("PSU"). Specifically, the medical records that Kroska-Flynn attaches to his declaration show on November 18, 2019, Kroska-Flynn met with Dr. Hoffman, who noted that Kroska-Flynn has believed he has fungal meningitis since 2017, and that although he saw a doctor in Duluth for his perceived infection, that doctor did not treat him for a fungal infection and instead recommended probiotics. (*See* dkt. #29-3.) Dr. Hoffman concluded in those notes that:

> I would expect if he had a meningitis, he would have become severely ill and probably d[ied] without treatment. I do not believe that an infectious disease consult is warranted, nor a spinal tap. I would repeat his labs in a month and see him back in 2. He has been seen by the psychologist on the unit, and he may actually do best with a referral to a psychiatrist. He does not seem happy with a prior trial of medication in 2017.

3

(*Id.*)

Kroska-Flynn subsequently met with Dr. Bret Reynolds, a psychiatrist, who attempted to prescribe him Abilify, an antidepressant, which Kroska-Flynn refused. Dr. Reynolds noted in particular:

> The patient seems to fit the diagnosis of delusional disorder . . . . while there is a low chance of having improvement of delusional disorder with the atypical antipsychotic, I still felt it would be worth trying, but Mr. Kroska is quite clear that he is not willing to engage in psychotropic medication treatment and so we ended our appointment on a polite and friendly note and I tried to assure him that my dictations and comments would not be used to "sabotage" his effort to get more intensive care . . . .

(dkt. #29-4.)

In a declaration submitted in opposition to Kroska-Flynn's motion, Dr. Hoffman also attests that he does not believe that Kroska-Flynn suffers from meningitis caused by a fungus. He bases this opinion on his examinations of Kroska-Flynn, as well as blood test results from October 7, 2019, January 9, 2019, and January 29, 2020, that did not show immune system activity or any conditions that require further assessments. Specifically, Dr. Hoffman obtained blood work showing a normal CBC; a normal erythrocyte sedimentation rate; a negative urinalysis, hepatitis B core antibody, HIV and tuberculosis. Dr. Hoffman attests that if Kroska-Flynn were suffering from a yeast or fungal infection or immune response, the results would not be normal. Similarly, Dr. Hoffman explained that if Kroska-Flynn had meningitis in 2017, the imaging at that time would have shown an inflammatory response. For all these reasons, Dr. Hoffman opines that Kroska-Flynn

4

should not be treated for meningitis, nor should he be sent for a consultation with an infectious disease specialist.[2]

### B. Analysis

A preliminary injunction is an "extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (internal citation omitted). The Seventh Circuit instructs that a district court should engage in a two-step analysis in evaluating a request for preliminary relief. "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Id.* at 661-62. If the moving party meets this first burden, then the court must weigh the factors against one another in a sliding scale analysis to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party (or public interest) will be harmed sufficiently, such that the injunction should be denied. (*Id.*) The Prison Litigation Reform Act ("PLRA") further limits the court's authority to enter injunctions in the prison context by prescribing that "remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right." *Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) (quoting 18 U.S.C. § 3626(a)(1)(A)).

---

[2] Kroska-Flynn is currently incarcerated by the Wisconsin Department of Corrections ("DOC") at Chippewa Valley Correctional Treatment Facility ("Chippewa"),

In his motion for a preliminary injunction, plaintiff Kroska-Flynn asserts that he wants to enforce his "right to constitutionally mandated adequate medical treatment" (dkt. #27), clarifying in his reply brief that he is seeking an order requiring a consult with an infectious disease specialist at UW-Madison to determine whether he is suffering from fungal meningitis. Defendants maintain that plaintiff has not made the showing necessary to justify a preliminary injunction, and at least on the current record, their argument is well-taken. As an initial matter, plaintiff is not seeking relief from defendants that are currently part of this lawsuit, which relates to a 2018 treatment for his rash while he was incarcerated at Stanley.

Even if the court were to grant plaintiff's motion to amend as discussed below, and he were allowed to proceed on claims related to his more recent treatment at New Lisbon, his evidence does not come close to meeting the threshold requirements for the grant of a preliminary injunction. In particular, plaintiff has presented no evidence indicating any need to be seen by an infectious disease specialist, much less that defendants' decision to deny that request amounts to deliberate indifference, as opposed to negligence. Instead, he merely *claims* that in July of 2019, Dr. Jean-Pierre said she would order him to be seen by an infectious disease specialist. At least at this point, however, the record of her contemporaneous treatment notes does not reflect that she even recommended a consult, much less ordered one. Without supporting evidence, plaintiff has offered this court no basis to grant preliminary relief.

Moreover, even if the court had some basis to accept plaintiff's assertion that someone modified Dr. Jean-Pierre's treatment notes as something more than pure

6

speculation, or assuming that Dr. Jean-Pierre *told* plaintiff that she would place an order, but then forgot to do so, Dr. Hoffman obviously never saw such an order and, on the record before him, simply disagrees that a separate consultation is necessary. On this record, the court has no basis to infer that his independent opinion is the product of Dr. Hoffman's deliberate indifference, rather than the exercise of his independent medical judgment (or of any of the health care professionals currently treating plaintiff). *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)); *see also Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (while a prisoner is entitled to reasonable measure to prevent a risk of harm, he "is not entitled to the best care possible").

This, too, is fatal to plaintiff's obligation, to show some likelihood of success on the merits of a deliberate indifference claim against Dr. Hoffman in declining to refer him to a specialist. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (a jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."); *see also Pyles*, 771 F.3d at 409 ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

Instead, plaintiff merely asserts that unless he is seen by an infectious disease specialist and has a spinal tap, it will be impossible to rule out meningitis as the cause of

his claimed, ongoing discomfort. Similarly, plaintiff further asserts that the blood tests Dr. Hoffman ran are "unreliable to diagnose meningeal involvement." (Dkt. #35.) As support for both assertions, plaintiff cites the following statements from the 2008 Current Medical Diagnosis and Treatment: "The diagnosis of disseminated Candida is problematic . . . while blood cultures are positive only 50% of the time in disseminated inflection"; and "A substantial proportion of individuals who have systemic disease without clinical signs of meningitis will have meningeal involvement, mandating examination of the cerebrospinal fluid." (Dkt. #35 at 4.) Assuming that this recital of the information from this resource is accurate, plaintiff still has offered *no* evidence suggesting that *he* has presented with symptoms even suggesting that this testing might be necessary to rule out meningitis, much less sufficient evidence for this court to infer it. On the contrary, as Dr. Hoffman noted, the medical evidence is that if Kroska-Flynn has actually been suffering from such a severe infection for so long, he would be presenting with much more severe symptoms, or he would have died already. Regardless, plaintiff cites no other evidence calling into question Dr. Hoffman's medical judgment, nor has he explained why *none* of the other health care professionals who have examined him suspected that he is suffering from meningitis or any other condition requiring him to be seen by a specialist. As such, he not shown any likelihood of success on the merits of his claim.

Finally, even assuming that plaintiff could show a likelihood of success on the merits, he has failed to submit evidence that he is suffering irreparable harm or that there is no adequate remedy at law. Indeed, beyond his reported symptoms, plaintiff's medical records before the court do not suggest that his current medical needs are not being met,

whether due to untreated meningitis or other serious yet undiagnosed illness. Accordingly, plaintiff has also failed to show that he has no adequate remedy at law, and his motion for a preliminary injunction must be denied.

II.     Motion regarding discovery (dkt. #47)

Also before the court is plaintiff's assertion that defendants have failed to respond to his requests to discuss discovery disputes. In response, defendants direct the court to their formal responses to five of his requests for production of documents, which the court addresses in order along with plaintiff's remaining concerns.

First, plaintiff requested video footage of an April 25, 2017, incident in which he passed out in his living unit. Defendants responded that no such footage exists because the video storage system records over earlier footage unless there is a reason to store it manually, and because no one thought to preserve the video footage from that day, they cannot produce it. In reply, plaintiff points out that the incident report related to this event included a comment, "Video evidence was recovered for review." (Dkt. #57-1, at 3), but this does not establish that the video footage *still* existed by the time defendants were asked to produce it, just that it was reviewed for purposes of the earlier incident report. Absent some evidence that plaintiff contemporaneously asked defendants to retain the footage, there is little the court can do now in terms of providing relief. That said, the court will require defendants to follow up to confirm within two weeks that no such footage was retained and still available for production.

Second, plaintiff requested all interoffice and intraoffice communications regarding his medical condition. Defendants produced 471 pages of his Health Services Unit ("HSU") and Psychological Services Unit records in response. They also ran a search of the institution's email system for his name, which returned over 9,000 emails that defense counsel represents were reviewed. So far, from that review, defendants represent they have produced 41 pages of emails, they are in the process of reviewing emails, and they will continue to produce responsive emails. Plaintiff asks that the court follow up with defendants to ensure that they continue to do so, which seems reasonable. Accordingly, although further intervention is hopefully unnecessary, the court will direct that defendants promptly complete their review and advise both plaintiff and the court when production of any additional, responsive emails will be completed. The court also expects the parties to work together to ensure that all responsive emails are produced within that timeframe. Failing that, plaintiff may renew his motion provided he has a good faith basis to believe that the production is incomplete after consulting with opposing counsel.

The parties appear to have resolved the third and fourth issues Kroska-Flynn raised.

Fifth, plaintiff requested copies of Access Management Software user manuals, and defendants responded that this information is confidential for security reasons and beyond the scope of discovery. The court is inclined to agree, especially since plaintiff has not explained why he needs copies of these manuals and in reply only vaguely argues that the manuals will help him "investigate his deliberate indifference claim." The court sees no connection between the two. Accordingly, the court sees no basis to compel defendants to turn them over.

In summary, the court will deny plaintiff's motion to compel in all respects save that within two weeks: (1) defendants shall either produce the video footage of the April 25, 2017, incident capturing Kroska-Flynn's fall, or confirm that it was overwritten subsequent to the writing of the incident report; and (2) defendants shall advise how soon they can produce to plaintiff any remaining, responsive emails and then fulfill that obligation, or confirm that all responsive emails have been produced.

### III.   Second motion to amend (dkt. ##48, 49)

Generally speaking, this court freely grants motions to amend. *See* Fed. R. Civ. P. 15(a)(2). However, "district courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). Since plaintiff's unexplained year-long delay in seeking leave to amend will undoubtedly prejudice defendants, the court will deny plaintiff's motion, although the amendment would likely be futile regardless.

Plaintiff seeks to add Eighth Amendment deliberate indifference claims against: an "Unknown Prison Official" who modified Dr. Jean-Pierre's notes; Dr. Hoffman; and Dr. Reynolds — the latter two for their involvement in plaintiff's medical care between November 2019 and early 2020, outlined above. Since plaintiff's proposed, new allegations track closely the facts asserted with respect to his request for a preliminary injunction, although the claims are new, the court will not repeat them here.[3]

11

The court granted plaintiff leave to proceed in this lawsuit on March 11, 2020 (dkt. #17), multiple months *after* the events outlined in plaintiff's proposed amended complaint occurred. On June 12, 2020, after conducting the preliminary pretrial conference, Magistrate Judge Crocker issued an order providing, in relevant part, that to amend his complaint, plaintiff would need to seek leave of court, emphasizing that the "longer you wait to ask for leave to amend, the less likely it is that the court will allow you to amend." (Dkt. #26, at 4.) Rather than seeking leave to amend at that point, plaintiff instead filed his motion for a preliminary injunction on July 6, 2020, charging these individuals with deliberate indifference and submitting evidence of Dr. Hoffman's and Dr. Reynold's treatment in support. This court then directed a response from defendants, who gathered evidence and sought out Dr. Hoffman's medical opinion.

It was not until October 28, 2020, when plaintiff filed his motion to amend. Yet even at that point -- six months after the court granted him leave to proceed -- plaintiff did not acknowledge or attempt to provide good cause for his delay; rather, he cited generally to the broad approval of amendments under Rule 15(a). Requiring defendants to do so now not only would delay resolution of this lawsuit, but would essentially require them to reopen their investigation of Drs. Hoffman's and Reynold's treatment of plaintiff. Since plaintiff has offered no good cause for his delay in moving sooner, nor can the court conceive of one, any claim that he may have against these putative defendants will have to wait another day in a different suit.

This question might be a closer call if plaintiff's proposed amendment did not also appear incapable of withstanding a motion to dismiss. *See Townsel v. DISH Network, LLC*,

12

668 F.3d 967, 969 (7th Cir. 2012) (measuring an amendment's futility by its ability to withstand a motion to dismiss). In particular, given that plaintiff and defendants have submitted the records of his appointments with Drs. Hoffman and Reynolds, along with his motion for a preliminary injunction, and those records are central to his claims against them, the court has considered those submissions in assessing the legal merit in plaintiff's proposed amendments. *See* Fed. R. Civ. P. 10(c); *McCready v. eBay, Inc.*, 453 F.3d 882, 891-92 (7th Cir. 2006) (documents attached to a motion to dismiss are part of the pleadings if they are referred to in plaintiff's complaint and central to the claim) (citations omitted). Reviewing plaintiff's proposed, additional allegations in conjunction with this evidence, and that submitted by plaintiff in support of his motion for a preliminary injunction, they simply to do not support a reasonable inference of deliberate indifference.

To state an Eighth Amendment claim, plaintiff must allege facts supporting an inference that his medical treatment demonstrates "deliberate indifference" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). "Serious medical needs" include (1) life-threatening conditions or those carrying a risk of permanent serious impairment if left untreated, (2) withholding of medical care that results in needless pain and suffering, or (3) conditions that have been "diagnosed by a physician as mandating treatment." *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997). "Deliberate indifference" encompasses two elements: (1) awareness on the part of officials that the prisoner needs medical treatment and (2) disregard of this risk by conscious failure to take reasonable measures.

Although there appears little, if any, medical evidence to support it, the court will construe plaintiff's claimed condition to be a serious medical need, since he alleges that it causes him severe pain and discomfort. Still, he has not alleged a basis to proceed against the three, proposed defendants on the facts alleged. To start, neither Dr. Hoffman's nor Dr. Reynolds' encounters with Kroska-Flynn support an inference that they failed to take reasonable measures in response to his symptoms, much less were indifferent to his serious medical needs. Indeed, plaintiff does not suggest that the treatment records outlined above inaccurately reflect how he reported his symptoms or these putative defendants' treatment decisions. Although plaintiff obviously disagrees with the refusal to refer him to a specialist, Dr. Hoffman is entitled to deference with respect to whether it is appropriate to refer someone to a specialist.[3] Further, the record of Dr. Reynolds' interaction with Kroska-Flynn does not suggest deliberate indifference; rather, it suggests that Dr. Reynolds was attempting to work with him to address his mental health issues by suggesting that he take an anti-depressant. Plaintiff might deny having mental health challenges, but his own allegation that he suffers from PTSD related to fears about his rash suggest that it was perfectly acceptable for Dr. Reynolds to discuss the possibility of a medication to treat depression. Accordingly, it would be unreasonable to infer that either Dr. Hoffman or Dr. Reynolds failed to exercise medical judgment in responding to Kroska-Flynn's reported symptoms.

---

[3] Dr. Hoffman's professional opinion related to plaintiff's condition might suggest that the claims plaintiff already is proceeding upon in this lawsuit related to any request to see an infectious disease expert face an uphill battle at summary judgment as well.

Finally, plaintiff would like to proceed against some Unknown Prison Official for allegedly deleting Dr. Jean-Pierre's order for an appointment with a specialist, but he has not alleged any facts related to when this alleged alteration occurred, much less who would have been responsible. As importantly, given Dr. Hoffman's judgment that an appointment with a specialist was unnecessary, there is no indication that this alleged alteration impacted Kroska-Flynn's treatment. Accordingly, the court will deny plaintiff's motion to amend, based on his undue delay, the prejudice amending would impose on defendants, and the likely futility of his claims.

### IV.     Motion for assistance in recruiting counsel (dkt. #42)

The court will also deny without prejudice plaintiff's motion for assistance in recruiting counsel. As previously explained in this lawsuit, civil litigants have no constitutional or statutory right to the appointment of counsel. *E.g.*, *Ray v. Wexford Health Sources, Inc.,* 706 F.3d 864, 866-67 (7th Cir. 2013); *Luttrell v. Nickel,* 129 F.3d 933, 936 (7th Cir. 1997). However, at the court's discretion, it may decide to help recruit counsel to assist an eligible plaintiff who proceeds under the federal in forma pauperis statute. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent an indigent civil litigant *pro bono* publico.")

Plaintiff repeats the arguments he raised previously regarding his cognitive challenges, adding that the complexity of this case is beyond his abilities, in particular raising the difficulty he faces in retaining a medical expert. However, the court remains unconvinced that litigating this lawsuit is beyond his capabilities. *See Pruitt v. Mote*, 503

15

F.3d 647 (7th Cir. 2007) (en banc) (the central question in deciding whether to request counsel for an indigent civil litigant is "whether the difficulty of the case–factually and legally–exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself"). Plaintiff's submissions confirm that he is well-aware of the facts and legal standards material to the claims upon which he is proceeding. Further, his motions — in particular, his motions seeking a preliminary injunction — demonstrate his ability to follow this court's procedures and the Federal Rules of Civil Procedure, to write well, and to apply the law to the facts of this case. That plaintiff has not been successful to date is not a reason to infer he cannot litigate this case. Furthermore, as to the complexity of this case, and the difficulty he has experienced retaining an expert, nearly all *pro se* litigants are untrained in the law and face similar challenges, many of them are raising issues about medical care.

There is no categorical rule that all prisoners challenging the adequacy of their medical care are entitled to counsel, much less a medical expert. *See Williams v. Swenson*, 747 F. App'x 432, 434 (7th Cir. 2019) (affirming district court's denial of request for counsel in medical care case); *Dobbey v. Carter*, 734 F. App'x 362, 364 (7th Cir. 2018) (same); *Romanelli v. Suliene*, 615 F.3d 847, 853 (7th Cir. 2010) (same). In this case in particular, the law governing plaintiff's claims is well established, and it is not clear yet whether this case will turn on questions requiring medical expertise. *See Redman v. Doehling*, 751 F. App'x 900, 905 (7th Cir. 2018) ("Redman could litigate his claims himself because they turned on historical facts as opposed to medical evidence"). That said, if it becomes clear, upon reviewing the parties' summary judgment submissions, that plaintiff needs an

16

expert to survive summary judgment or prove his claims at trial, the court would be willing to consider recruiting a neutral expert to review his medical records and provide an opinion about his treatment. Additionally, if this case proceeds to trial, the court may reconsider plaintiff's request, given the more complex challenges presented by a trial. Accordingly, plaintiff's request for assistance in recruiting counsel will be denied without prejudice.

ORDER

IT IS ORDERED that:

(1) Plaintiff Donovan Kroska-Flynn's motion for a preliminary injunction (dkt. ##27, 38) is DENIED.

(2) Plaintiff's motion for assistance in recruiting counsel (dkt. #42) is DENIED without prejudice.

(3) Plaintiff's motion regarding discovery (dkt. #47) is DENIED in part and GRANTED in part as set forth above. Within two weeks: (1) defendants shall either produce the video footage of the April 25, 2017, incident capturing Kroska-Flynn's fall, or confirm that it was overwritten subsequent to the writing of the incident report; and (2) defendants shall advise how soon it can produce to plaintiff any remaining, responsive emails and then fulfill that obligation, or confirm that all responsive emails have been produced.

(4) Plaintiff's second motion to amend and supplement complaint (dkt. ##48, 49) is DENIED.

Entered this 19th day of January 2021.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge