IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DONAVAN KROSKA-FLYNN,

                    Plaintiff,                              OPINION AND ORDER

          v.                                                     18-cv-304-wmc

REED RICHARDSON
and JAMIE BARKER,

                    Defendants.

        *Pro se* plaintiff Donovan Kroska-Flynn, who was previously incarcerated by the
Wisconsin Department of Corrections ("DOC") at the Stanley Correctional Institution
("Stanley"), brought this lawsuit under 42 U.S.C. § 1983 to challenge the medical care he
received while he was incarcerated. In particular, this court granted Kroska-Flynn leave to
proceed against Stanley employees Jamie Barker and Reed Richardson for alleged
deliberate indifference to his reports of various symptoms caused by candida, a fungal
infection. Currently before the court is defendants' motion for summary judgment. (Dkt.
#70.) Since the evidence of record, even when construed in a light most favorable to
Kroska-Flynn, would not permit a reasonable jury to find in plaintiff's favor, the court is
granting defendants' motion, entering judgment in their favor and closing this case.

**A. Parties**

Donovan Kroska-Flynn was incarcerated at Stanley from March 23, 2017, to June 26, 2018, when the events comprising his claims in this lawsuit took place.

Defendant Jamie Barker is employed by the DOC as the Health Services Manager ("HSM") of Stanley's Health Services Unit ("HSU"). Barker is a registered nurse, and in her role as HSM, she works with the primary care physician, dentist, psychiatrist, and specialists who consult with the Bureau of Health Services ("BHS") to provide medical care to prisoners. As a result, the HSM does not evaluate, diagnose, determine courses of treatment, or prescribe medications. Instead, the HSM generally defers to the appropriate Advanced Care Providers ("ACP's") for treatment plans and decisions. Moreover, she does not have the authority to override ACP's orders, although she may raise concerns about an ACP's decisions to a higher-level position within BHS. Barker further attests that she has no direct care contact with inmates in her role as HSM, while plaintiff Kroska-Flynn attests that Barker was one of the first people at Stanley to examine him. Still, it is undisputed that no health care provider ever raised any issues about Kroska-Flynn's medical care with Barker.

---

[1] Except where noted, the court draws the following, undisputed facts from the parties' proposed findings of fact and responses, as well as supporting evidence. In addition, Kroska-Flynn previously filed a motion to compel certain video footage, certain emails and documents (dkt. #65), and on January 19, 2021, the court directed defendants to advise whether the footage exists and has been preserved, and when they would complete their production of the emails and documents. The defendants then timely responded, representing that the video footage of the fall was not preserved and that they had already sent plaintiff the other, remaining emails and documents to be produced. Kroska-Flynn has not replied contesting defendants' representations or asking for any other relief from the court related to his discovery requests, so this motion will be denied as moot.

Defendant Reed Richardson served as Stanley's warden from March 23, 2014, until July 3, 2020, when he retired. As warden, Richardson did not personally provide medical services to inmates. Instead, he deferred to and relied on qualified health care providers to make medical diagnoses and treatment decisions. Similarly, when Richardson received complaints from inmates related to health matters, he would refer the complaint to HSU staff for their review and response.

### B. Kroska-Flynn's requests for medical attention

Since at least 2016, Kroska-Flynn has believed that he suffers from fungal meningitis due to a candida infection. In response to this concern, numerous medical providers, including those at Stanley, have evaluated Kroska-Flynn for candida or fungal meningitis. Specifically, before Kroska-Flynn arrived at Stanley, he was incarcerated at Dodge Correctional Institution and received treatment for a rash on his left arm, including treatment with hydrocortisone cream and Benadryl, which Kroska-Flynn says was ineffective, and his stool was checked for parasites, which came back normal. Kroska-Flynn also reports experiencing symptoms of vertigo and head pressure at Dodge.

When Kroska-Flynn arrived at Stanley in March of 2017, he sought further medical attention by submitting a Health Services Request form ("HSR"). Registered nurses in the HSU triage HSR's daily, and attempt to respond to every HSR within 24 hours of receipt, prioritizing appointments based on patient need. Every HSR is triaged in this same manner, regardless of whether an inmate directs it to HSM Barker or the HSU generally. Therefore, any HSR that Kroska-Flynn may have directed to Barker specifically would not be routed to her, but forwarded to HSU staff for triaging and response.

On April 24, 2017, Kroska-Flynn requested new labs to test for a fungal infection; he also reported ringing in his ears and head pressure. On the morning of April 25, 2017, before he was seen in the HSU, Kroska-Flynn allegedly also lost consciousness in his living unit while he was having breakfast. Believing that Kroska-Flynn may have had a seizure, the officers present arranged for his transport to the HSU. An incident report about Kroska-Flynn's loss of consciousness was also created, which HSM Barker apparently received on April 28. (Pl. Ex. 2 (dkt. #79-2).)

In the HSU, Kroska-Flynn was assessed by staff, but was provided no treatment, nor did he undergo any testing. Among other things, a progress note detailing the events that took place that day indicate: (1) "No seizure activity present"; (2) Kroska-Flynn was steady on his feet and followed verbal direction; and (3) Kroska-Flynn reported emotionally something that felt like "rice krispies" was "eating" his brain, which he believed might be related to a recent tooth infection. (*See* dkt. #79-4, at 1.) Kroska-Flynn further reported head pain, which was alleviated a little by ibuprofen and Tylenol. Finally, the progress note indicates that: a doctor and the PSU were both informed about the events of that morning; and at about 8:20 that morning, HSU staff -- including Dr. Hannula and a nurse -- decided to send him back to his housing unit.

At that point, however, Kroska-Flynn apparently refused to leave the HSU, leading to his placement in the Restrictive Housing Unit ("RHU").[2] While Kroska-Flynn does not

---

[2] Kroska-Flynn includes multiple proposed findings of fact related to the conditions he experienced while in restrictive housing. Since those proposed facts are not material to his claims in this lawsuit, or the grounds of defendants' summary judgment motion, they have not been included in this factual summary.

elaborate on what medical conditions he believes were being was left untreated, a meeting of numerous Stanley officials (including Barker) was held later that morning to address both his mental health and medical concerns. The minutes further reflect that numerous Stanley employees were present at the meeting, with the purpose of discussing Kroska-Flynn's concern about his medical problems, and in particular, his belief that something was eating away at his brain. (Dkt. #79-1) at 35.)

By the next day, April 26, 2017, Kroska-Flynn reported that he was afraid to eat. While Korska-Flynn claims a nurse deemed his statement to be a "hunger strike," defendants note that the email Kroska-Flynn cites for this fact also includes the comment: "When RHU notified to do a food monitor, they reported that he had eaten breakfast and lunch today." (Dkt. #79-1, at 32.) That same day an officer also drafted an incident report, which while noting Kroska-Flynn's "hunger strike," further states that he had taken a meal tray at breakfast, lunch and dinner. (Dkt. #79-3, at 2.) In fairness, Kroska-Flynn reported wanting to harm himself that day as well.

At that point, Kroska-Flynn began being seen by an HSU nurse on a weekly basis, at least through May of 2017, and he submitted numerous HSRs reiterating his belief that he was suffering from some sort of an infection that was affecting various bodily functions. On May 1, 2017, Kroska-Flynn next submitted an HSR stating, "Today I feel better than I have for months. [However] I still feel concerned that there is some type of bacterial issue that not only goes unnoticed by my immune system but might be something perhaps you guys have not dealt with before." (Ex. 502 (dkt. #73-1) 18.) The next day an HSU

nurse responded that he was scheduled for a follow up visit with a nurse on May 3, 2018. Kroska-Flynn also submitted another HSR, raising concerns about a tooth infection:

> Infection can migrate from tooth to ears/nose/brain and can in capsulize in brain and mimic meningitis, cause confusion, muscle spasms, etc. Also without elevated temp can end in stroke or coma. My upper left steel root canal was chronically infected. Then abscess for 5-6 months before it was extracted.

(*Id.* at 17.) On May 3, a nurse responded that: (1) she spoke with the doctor and the dentist; (2) his tooth was removed; (3) he had been seen since the removal; and (4) the doctor and dentist both agreed that he did *not* have an infection. The nurse further advised Kroska-Flynn that if he needed a sick call, a nurse would see him.

Instead, on May 3, Kroska-Flynn submitted yet another HSR, raising concerns about a tooth infection, and on May 5, a nurse responded that the HSR had been forwarded to an ACP for review. In the meantime, an HSU nurse also saw Kroska-Flynn for a follow-up on May 4. He reported: having muscle twitching; feeling like his scalp/skull was going to cave in, if hit; and an encapsulated abscess in his head. Kroska-Flynn reported that it was only good when he was on an antibiotic. After updating Kroska-Flynn's social worker about his concerns, the nurse finally noted that his social worker and Dr. Fry would test him upon release from the restrictive housing unit. (*Id.* at 10.)

Kroska-Flynn further submitted an HSR on May 5 stating, "I need to see a real doctor to get penicillin. Imagine a painful bad tooth. Now imagine that inside your brain. I am having many bad side affects from my root canal being infected for so long because I was given salt water." (*Id.* at 15.) An HSU nurse responded by telling Kroska-Flynn that:

(1) there was no medical need for antibiotics at that time; and (2) he was scheduled for a nurse appointment.

Finally, still on May 5, Kroska-Flynn was seen by a nurse again, and reported feeling like he had an infection in his head, someone was choking him, and his chest was tight. At that point, this second nurse noted that Kroska-Flynn had a regular heart rhythm, and he seemed reassured that his symptoms were not heart related. That nurse also urged him to try to relax with deep breathing and exercise. Last, the nurse noted that the psychological services unit ("PSU") had been informed of his complaints, after Kroska-Flynn reported feeling as though the HSU was not helping him.

On April 27, 2017, Kroska-Flynn next submitted an Interview/Information Request to Warden Richardson, stating that his medical issues were not getting addressed. As was his practice, Richardson passed that letter to the HSU for staff to review and address, while also responding directly to Kroska-Flynn on May 15, 2017, by letter as follows:

> I have received your correspondence in which you discuss medical concerns. Medical concerns such as these should be addressed through the Health Services Unit as these matters [are] best left to the judgment of medical professionals. Further, due to the protection of your health information and in accordance with HIPAA (Health Insurance Portability and Accountability Act), I cannot address your specific concern[.] Nevertheless, I have shared your concerns with the Health Services Unit for their review and response.

(Ex. 501 (dkt. #74-1) 3.)

About this same time, May 12, Kroska-Flynn had again been seen by an HSU nurse for case management, who encouraged him to share his feelings, which prompted Kroska-Flynn to offer that he still felt he needs penicillin and still felt an infection in his head.

Kroska-Flynn further acknowledged having "come a long way," but nevertheless feeling scared it might come back and having frequent headaches and pressure in his head. After consulting with a physician, the nurse scheduled a follow-up visit for one week.

Nevertheless, just four days later, May 16, Kroska-Flynn submitted yet another HSR, complaining that: "There is a lot of pressure behind my left cheekbone. There is a spot on my gums where it's trying to force it out. Can someone just either cut it out or stick a needle in it and suck the poison out?" (Ex. 502 (dkt. #73-1) 14.) The very next day, a nurse responded by scheduling Kroska-Flynn for an immediate sick call, resulting in his being seen by a nurse that same day, during which he reported concerns about a spot on his gums, an infection, pressure, and a brain infection. However, the nurse's note on May 17 does not indicate actual evidence of an infection, swelling or a bump. Accordingly, Kroska-Flynn was encouraged to seek out enjoyable or distractive activities and to avoid isolating himself.

On May 19, Kroska-Flynn was next seen for his weekly nurse visit. He reported improvement but that he still thought there was something wrong, possibly a "fungus bacteria" in his blood. (*Id.* at 8.) Kroska-Flynn was again encouraged to avoid dwelling on the tooth extraction/infection and scheduled for another follow-up in one week. Even so, Kroska-Flynn submitted two more HSRs that day alone, asking if he could be checked for "black mold," and whether there was a treatment if he breathed in black mold. Kroska-Flynn also asked to be checked for Lyme's disease. A nurse responded to both HSR's the next day, May 20, reminding him that he was scheduled for another nurse visit on May 26, at which point he could raise his concerns. Nevertheless, Kroska-Flynn submitted

another HSR that day, repeating his request for a Lyme's disease test, prompting a nurse to respond immediately by repeating that he was already scheduled for a nurse visit.

On May 26, Kroska-Flynn was again seen by a nurse. He reported feeling "better" and finding it easier to accept that he does not have a brain infection from an infected tooth, although then adding that: "It is difficult to believe that something isn't wrong. I've been thinking I should get tested for Lyme's disease." (*Id.* at 7-8.) Kroska-Flynn also offered that he remembered finding a few ticks on himself about a year and a half ago. In response, the nurse noted his progress, encouraged him to continue improvements, and assured him that he had no physical abnormalities. Kroska-Flynn was also encouraged to try meditation. The progress noted indicated that a physician was informed about Kroska-Flynn's request for a Lyme's test, and he was scheduled for a follow-up in a week.

On July 28, 2017, Kroska-Flynn also underwent an MRI of his brain, which showed no signs of a stroke, tumor, or inflammatory response.[3] According to Dr. Karl Hoffman, who treated Kroska-Flynn when he was later incarcerated at New Lisbon and reviewed his previous medical records, if Kroska-Flynn had meningitis, an inflammatory response would be expected.

On January 8, 2018, Kroska-Flynn next submitted an HSR seeking a "candida cleanse," prompting his being scheduled for sick call the next day. After a nurse saw him as scheduled, Kroska-Flynn requested a candida cleanse, stating that he believed that his

---

[3] Kroska-Flynn claims that the MRI was inadequate because it was without contrast and sought only to determine whether he suffered from a delusional disorder, but the evidence of record does not support that finding. Rather, the findings expressly include results related to his overall brain health. (*See* dkt. #79-14, at 2.)

colon was "filled with gunk" from taking antibiotics in the past. Kroska-Flynn further stated, "I think that's why I was tripping before," and "I'm not a depressed person, but I think this worrying is depressing me." (Ex. 502 (dkt. #73-1) 6.) That request was also forwarded to an ACP.

On January 22, Kroska-Flynn next submitted an HSR formally requesting a test for candida, reporting that he felt like "crap all the time" and raising a concern about cancer. The next day a nurse scheduled him for sick call, and he was seen. Kroska-Flynn reported taking antibiotics in the past, that probiotics were unhelpful, and he continued to have concerns about candida, fatigue, bloating and gas. Still, Kroska-Flynn rejected the nurse suggestion of Simethicone (a medication to treat his gas), and the nurse scheduled a blood pressure check for one week.

On January 24, 2018, Kroska-Flynn again requested a colon cleanse and/or a check for cancer, to which a nurse responded that same day, noting that he had just been seen by a nurse the day before. Kroska-Flynn submitted another HSR dated January 26, which requested a second opinion about whether it is healthy to allow candida to grow in his system for years, adding that he had pain in his head and was feeling "crappy and sluggish 100% of the time." (Ex. 502 (dkt. #73-1) 22-23.)

On January 30, a nurse responded that: he had been seen by his case manager that day; PSU had again been contacted; and had indeed been seen by a nurse that day. She further asked him why he believed he had candida, to which he responded that he had been reading any books he could find about diseases, and he was making "an educated guess" about what it might be. Kroska-Flynn also wrote that he was being proactive by

eating a Kosher diet and being healthy, and expressed a belief that antibiotics had caused his candida. Relatedly, the nurse noted that Kroska-Flynn had been counseled recently by HSU staff about the overuse and misuse of antibiotics. However, she also told him that MRIs can detect candida, and it had *not* been detected by his MRI. Finally, the nurse contacted PSU to describe the visit. She also consulted with a medical doctor before requesting follow up in a week.

On January 30, Kroska-Flynn submitted another Information Request, stating: "I'm writing to inform you that repeatedly with no success, HSU staff refused to test, acknowledge, or treat me for 'candida Albicans.' I realize they don't think it is medically necessary, but I want this treatment for future health benefits. You can even bill me for it." (Ex. 502 (dkt. #73-1) 24-25.) This request was forwarded to HSM Barker on January 31, to which Barker immediately responded that Kroska-Flynn should see his assigned nurse case managers. (*Id.* at 25.) Nurse case managers are registered nurses that are specifically assigned to a patient and assist with coordination of various elements involved in the care of an individual patient. This allows the patient to be able to receive a consistent message, as well as get assistance in communicating their medical needs.

On February 5, 2018, Kroska-Flynn also wrote to Warden Richardson, stating that he had concerns about his health care:

> I'm writing to inform you that HSU has continually denied to acknowledge test/treat me for candida Albicons. I've been in touch with my family who has been speaking with a Doctor from my church who believes that I have a systemic fungal infection due to prolonged candida yeast overgrowth. The treatment for this is very inexpensive and dealt with over a period of 8 weeks. No matter what I do or say medical Health

> Services refuses to take any action. My wife and parents are
> speaking to lawyers.

(Ex. 501 (dkt. #74-1) 4.) That same day, Richardson responded by directing Kroska-Flynn to follow the appropriate chain of command. In particular, he was advised to contact HSM Barker about his issues.

On February 6, 2018, a nurse saw Kroska-Flynn for his weekly nursing visit. He reported that he was sure he had a "systematic overgrowth of yeast" and needed a total body flush. The nurse encouraged him to contact PSU, and he agreed to consider that option. The nurse also updated PSU about what Kroska-Flynn reported that day, referred him to an ACP to rule out a yeast infection, and scheduled him for a one-week follow-up. On February 13, 2018, a nurse again met with Kroska-Flynn as well, and he reported a strongly-held belief that he had a candida infection and wanted a cleanse. Kroska-Flynn added that his girlfriend and pastor had been researching "systematic candida infection," and he believed he had many of the symptoms associated with such an infection. According to Kroska-Flynn, he also had a rash and discolored lesion. In response, the nurse encouraged him to include mental health services in his overall approach to mental health care.

Dr. Hannula met with Kroska-Flynn a week later, on February 20, reporting that he was "pretty sure candida has been my whole issue all along," repeating his request for something to cleanse his body. (Ex. 502 (dkt. #73-1) 2.) Dr. Hannula followed up by asking him to clarify his symptoms, and Kroska-Flynn reported: feeling dehydrated, dry and flaky skin, looking pale, being tired all the time, his body "over-working to detoxify itself," a recurring rash on his left forearm, feeling his body was not "assimilating nutrients

properly," smelly feces, unusual trouble concentrating, and feeling that candida was affecting how his brain was feeling. Afterward, Dr. Hannula wrote in the assessment and plan, "Persistent somatic delusions-attempt to discuss symptoms of systematic candidiasis. He will continue to work with his therapist." (Barker Decl. (dkt. #73) ¶ 54.) Barker explains that a patient who experiences somatic delusions is convinced that he suffers from serious health problems, despite assurances from medical professionals that he is perfectly fine. However, Kroska-Flynn denies that he is delusional.

Later on February 20, Kroska-Flynn submitted another HSR complaining that: "I asked for a second opinion. You say there's no test for it. It is unacceptable to wait until I get severe health problems to act on it." (Ex. 502 (dkt. #73-1) 21.) A nurse responded the next day, noting that he had just met with Dr. Hannula, yet Kroska-Flynn submitted another HSR on February 22, reporting a lump on the left side of his neck, writing "If it is cancer my chances of surviving would drastically increase[] [i]f I clean out my colon as well as eliminate the candida." (Ex. 502 (dkt. #73-1) 19.) The next day, February 23, Barker also received a letter from Kroska-Flynn in which he wrote that Dr. Hannula told him there was no test to confirm whether he had a candida yeast overgrowth and asked for a second opinion. He also complained that the cost of treatment was relatively low and could be as simple as antibiotics. He added that his symptoms included heart pain, irritability and itching, and a feeling that his kidneys were dying, as well as that he was afraid to eat and wanted to die. Kroska-Flynn concluded the letter by writing, "If someone heals me, I'll leave you alone, if not this is my notice that I will be taking legal action." (Ex. 502 (dkt. #73-1) 20.) A nurse responded that she would discuss his concern at his weekly visit the

next day.  On March 5, 2018, Barker noted Kroska-Flynn's letter, and that Dr. Hannula, Dr. Luxford (his psychiatrist), and his psychologist were all working on a plan with him. (Barker Decl. (dkt. #73) ¶ 60.)[4]

### C. Kroska-Flynn's treatment outside Stanley

On June 26, 2018, Kroska-Flynn was released from Stanley on extended supervision.  Shortly after his release, Kroska-Flynn attended several appointments at Essential Health in Duluth, Minnesota, to address a rash and raise concerns about a "systemic infection."  (*See* Pl. Ex. 18 (dkt. #79-18) DOC-217.)  Those records similarly reflect no diagnose of meningitis.  Instead, on July 19, 2018, a family doctor recommended testing for an infection or inflammatory response.  However, Kroska-Flynn declined that testing as well.  Instead, the medical notes state that he again expressed concerns about candida and requested something to "wash it away."  On August 29, 2018, Kroska-Flynn had a follow-up visit, the medical record of which once again show no signs or symptoms of a fungal infection.

Kroska-Flynn's supervised release was revoked on June 21, 2019, and he was eventually placed at New Lisbon Correctional Institution ("New Lisbon") on September 3,

---

[4] According to Kroska-Flynn as of March of 2018, he was still being seen by HSU for a rash.  (*See* Pl. Ex. 15 (dkt. #79-5) 31.)  The medical note on that day indicates:  (1) he had a "small rash on head, non-raised," as well as pimple-like areas on his left forearm; (2) the nurse provided him ibuprofen; and (3) Kroska-Flynn declined the offer of ointment for his rash.  (*Id.*)  However, Kroska-Flynn has not indicated any point in which he raised a concern about a rash on his head after March of 2018.

2019. At New Lisbon, Kroska-Flynn was seen by Dr. Cheryl Jean-Pierre, who ordered a trial of fluconazole 150 mg once per week for 8 weeks, which Dr. Hoffman explains would treat a fungal skin infection, but not meningitis caused by a fungus. (Hoffman Decl. (dkt. #33) ¶ 17.) Nevertheless, Kroska-Flynn attests that the fluconazole prescribed by Dr. Jean-Pierre alleviated the itch *inside* his head, the abnormal sensations in his body, and the rash itself. (Kroska-Flynn Decl. (dkt. #29) ¶ 5.) According to Kroska-Flynn, Dr. Jean-Pierre also told him that she would schedule him to see an infectious disease specialist, but there is no medical note confirming that statement, nor any record reflecting such an order.

Subsequently, Dr. Hoffman met with Kroska-Flynn several times to address his belief that he was suffering from fungal meningitis, running multiple tests that did not support that diagnosis. Dr. Hoffman attests that he does not believe Kroska-Flynn suffers from meningitis caused by a fungus. He bases this opinion on his examinations of Kroska-Flynn, as well as tests showing no abnormal immune system activity or any other conditions that require further assessment. Dr. Hoffman further attests that if Kroska-Flynn were suffering from a yeast or fungal infection or immune response, those results would not be normal. Similarly, Dr. Hoffman explained that if Kroska-Flynn had meningitis in 2017, the imaging at that time would have shown an inflammatory response. For all these reasons, Dr. Hoffman opines that Kroska-Flynn should *not* be treated for meningitis.

Dr. Hoffman also referred Kroska-Flynn to the Psychological Services Unit ("PSU") on November 18, 2019. Dr. Hoffman later noted that:

> I would expect if he had a meningitis, he would have become severely ill and probably dead without treatment. I do not

> believe that an infectious disease consult is warranted, nor a
> spinal tap. I would repeat his labs in a month and see him back
> in 2. He has been seen by the psychologist on the unit, and he
> may actually do best with a referral to a psychiatrist. He does
> not seem happy with a prior trial of medication in 2017.

(Dkt. #29-3.)

Kroska-Flynn subsequently met with Dr. Bret Reynolds, a psychiatrist, who attempted to prescribe him Abilify, an antidepressant, which he refused. Dr. Reynolds noted in particular:

> The patient seems to fit the diagnosis of delusional disorder . .
> . . while there is a low chance of having improvement of
> delusional disorder with the atypical antipsychotic, I still felt it
> would be worth trying, but Mr. Kroska is quite clear that he is
> not willing to engage in psychotropic medication treatment
> and so we ended our appointment on a polite and friendly note
> and I tried to assure him that my dictations and comments
> would not be used to "sabotage" his effort to get more intensive
> care . . . .

(Dkt. #29-4.)

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences

supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Both defendants seek summary judgment on the merits of plaintiff's Eighth Amendment claims, as well as on qualified immunity grounds.

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate objective and subjective elements: (1) an objectively serious medical condition and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). In this case, defendants seek summary judgment on both elements.

## I. Serious Medical Need

A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997). A medical need may also be serious if it otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Defendants seek summary judgment on this element because no evidence suggests that plaintiff actually suffered from fungal meningitis caused by candida. While plaintiff

*believes* otherwise, there is *no* objective evidence confirming his belief that he suffered from meningitis caused by candida, or any other fungal infection for that matter. To the contrary, the only medical evidence related to plaintiff's condition suggest that he never suffered from *any* sort of infection requiring treatment: his June 2017 MRI was clear, numerous blood tests and a stool sample from 2017 were normal; none of the assessments he underwent while out of prison suggest he was suffering from *any* medical condition placing him at risk of harm or severe pain; and when he was reincarcerated, Dr. Hoffman, Dr. Hannula and numerous nurses examined him repeatedly, finding no objective symptoms confirming plaintiff's belief that he was suffering from candida or any other severe condition caused by candida, including meningitis. Critically, plaintiff also reported no severe or worsening pain, nor any symptoms warranting pain management. Instead, his reported symptoms between 2017 and 2018 were cryptic, and he admitted that the ibuprofen and Tylenol he was receiving alleviated the headaches he periodically reported. As a result, the HSU staff examining him during the relevant time period came to what appears to be a unanimous agreement that plaintiff was suffering from mental health issues for which he repeatedly refused treatment.

In fairness, plaintiff *did* complain about a rash as early as January of 2017, when he was located at Dodge, as well as reported fear of food, itchiness, painful head pressure and ringing in his ears. He also appears to have suffered from some kind of short-lived *possible* seizure-like episode. Despite this recitation of his symptoms, however, a serious problem was *never* identified after testing and medical attention from Stanley's HSU staff. Moreover, even if the court accepts that plaintiff *was* suffering from a rash when he

presented at Dodge, plaintiff did not raise any concern about that rash at Stanley; rather, his focus shifted to expressing fear of foods and an undiagnosed brain condition, which has never been substantiated by any health care provider.  Accordingly, defendants are entitled to summary judgment with respect to the objective element of the deliberate indifference claim.  To avoid any uncertainty, however, the court will also address the subjective element of the claim as to both defendants, since there is no question that each is also entitled to summary judgment with regard to the deliberate indifference element.

## II.    Deliberate indifference

Proof of "deliberate indifference" must meet a high standard, by showing that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).   Generally speaking, *more than* negligent acts, or even grossly negligent acts, is required, although something less than *purposeful* acts is sufficient.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  More specifically, evidence of the threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to

immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

In their supervisory roles at Stanley, defendants seek summary judgment because they were not responsible for handling plaintiff's specific medical diagnosis or care, and when they did communicate directly with plaintiff they responded appropriately. Regardless, defendants also argue that plaintiff received adequate medical care throughout his time at Stanley. In opposition, plaintiff maintains that both defendants were involved in his medical care and responded with deliberate indifference. On this record, while both defendants were aware of some aspects of plaintiff's medical care -- and thus not absolved from all liability for lack of personal involvement alone -- the court agrees that defendants Barker and Richardson did not respond with deliberate indifference to any arguably serious medical need brought to their attention. The court addresses that record as to each defendant separately below.

## A. Barker

Barker was not involved in the majority of plaintiff's medical care between April of 2017 and June of 2018, but she was well-aware of his *belief* that he was suffering from a brain condition starting in April of 2017, and she responded directly to two communications from plaintiff about his broader belief that his medical care was being mismanaged. To be held liable under § 1983, however, a plaintiff must prove the defendant's personal participation or direct responsibility for the constitutional

deprivation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016). In particular, "a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728). Furthermore, "[s]ection 1983 does not establish a system of vicarious responsibility.

As a result, liability depends on proof of each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (citation omitted). And "for a supervisor to be liable, they must be 'personally responsible for the deprivation of the constitutional right.'" *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). Specifically, to establish personal involvement, the supervisor must "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)). Given Barker's correspondence with plaintiff and other HSU personnel about his request for treatment, she is not entitled to summary judgment for lack of personal involvement, but there is no evidence that she was either aware of an employee's constitutional violation and allowed it to continue *or* that she responded to plaintiff's need for medical attention with deliberate indifference herself.

Plaintiff nevertheless argues that Barker mishandled his claims of candida and meningitis from April of 2017 forward. As an initial matter, no evidence of record suggests Barker was aware of plaintiff's requests for medical attention until April 25 -- the day he lost consciousness and fell. Accordingly, Barker cannot be held liable for any injury

plaintiff may have sustained from that fall, since she was plainly unaware of any risk that he would lose consciousness that day. Similarly, her response to that incident was not deliberate indifference. To the contrary, after his fall, Barker was part of a meeting to discuss plaintiff's belief that he had a brain infection and how to address it going forward, since plaintiff had just recently arrived at Stanley. Although plaintiff may have raised concerns about his health at that point, the progress notes and incident report show that medical personnel confirmed plaintiff had not suffered a seizure and did not actually need medical attention. No evidence suggests that more intensive or immediate attention to his concerns were necessary that day or, as importantly, that *Barker* was aware that plaintiff had unmet medical needs, much less failed to take corrective action based on such knowledge.

Barker also responded to plaintiff's concerns about his medical care on January 31 and March 5, 2018, and neither response supports a finding that she ignored or responded unreasonably to plaintiff's serious medical needs. Specifically, on January 31, Barker responded to plaintiff's claim that his medical needs were not being met by directing him to raise his concerns with his nurse case manager, who he was meeting with on a weekly basis at that point. Plus, plaintiff's nurse case manager took appropriate action a week later, when she forwarded plaintiff's concerns to the ACP and PSU. Although plaintiff insists that his case manager mishandled his care, Barker had no reason to believe that his case manager would not provide him needed medical care. Moreover, his case manager took as much action as Barker herself could have as a nurse, by referring his concerns to an ACP.

Similarly, in response to plaintiff's February 23 complaints about how Dr. Hannula was handling his medical care, Barker did not respond directly but another nurse did. Then on March 5 , Barker wrote a follow-up, noting that his concerns had been considered and forwarded on to plaintiff's psychologist, psychiatrist and Dr. Hannula for action. A reasonable jury would have no basis to question Barker's response on this record. First, as of March 2018, Stanley health care professionals had concluded that plaintiff was suffering from the delusion that he had a systematic infection from candida, something wholly without support under any objective criteria. Second, just a few days before Barker followed up, Dr. Hannula had met with plaintiff and attempted to figure out his symptoms, ultimately concluding, based on plaintiff's vague response and preoccupation about a brain condition, that plaintiff was dealing with delusions, establishing a plan for him to work with his therapist.

Of course, Barker may have been in a position to inquire with Dr. Hannula as to whether *more* interventions were necessary, but no evidence reasonably suggests that she had reason to make such inquiries, nor does the Eighth Amendment require her to take such a step without cause. Rather, nurses are entitled to defer to physician's treatment decisions, unless they are *clearly* problematic. *See Rice ex rel Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) (nurses are entitled to rely on judgment of physicians but may "not unthinkingly defer to physicians and ignore obvious risks to [an inmate's] health"); *Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (prison health administrator, who was also a nurse, could defer to doctor's decisions), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). While plaintiff continues to claim that his

symptoms were real and significant, and asserts health care professionals cannot simply ignore his complaints, the record does not even suggest that Barker had reason to doubt their approach to plaintiff's medical care, much less reason to believe that their treatment was clearly problematic. Again, on the contrary, the record shows Dr. Hannula did not *ignore* plaintiff's reported symptoms and beliefs about his condition; she simply saw no objective criteria that led her to agree with plaintiff's self-diagnoses. Accordingly, Barker's decision not to respond directly to plaintiff's February 23 concerns, and instead to acknowledge his latest communication with an ACP does not support a finding of deliberate indifference.

Accordingly, the court has no basis to infer (reasonably or otherwise) that Barker's response to plaintiff's concerns about candida and infection demonstrated deliberate indifference, rather than a good faith (indeed, wholly justified) disagreement between plaintiff and Barker, as well as the other health care professionals treating him. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)); *see also Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (while a prisoner is entitled to reasonable measures to prevent a risk of harm, he "is not entitled to the best care possible"). Regardless, since plaintiff was receiving consistent attention from the HSU, and no ACP believed that he needed additional assessments or some different approach to his treatment, no reasonable fact-finder could infer that Barker responded to plaintiff's medical condition with

deliberate indifference.  *See Budd v. Motley*, 711 F.3d 840, 844 (7th Cir. 2013) (while plaintiff was dissatisfied with his medical care, deliberate indifference claims were properly dismissed because the record established that he had "received medical attention, medication, testing and ongoing observation").  Therefore, Barker is entitled to summary judgment.

## B.  Richardson

As for Warden Richardson, "[a]n inmate's correspondence to a prison administrator may . . . establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation."  *Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015) (citing *Vance v. Peters*, 97 F.3d 987, 992-93 (7th Cir. 1996)).  Still, *non*-medical prison officials are generally entitled to defer to the treatment decisions of medical professions unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."  *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *see also Askew v. Davis*, 613 F. App'x 544, 548 (7th Cir. 2015);(nonmedical officers may be found deliberately indifferent if they had actual knowledge of other's mistreatment) (citation omitted); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (jail administrator, who consulted with medical staff forwarded inmate's concerns to medical staff, and timely responded to inmate's complaints was entitled to defer to jail health professionals, "so long as he did not ignore" the inmate).

Richardson's involvement only consists of (1) his May 15, 2017, letter responding to plaintiff's April 27, 2017, concerns, and (2) his February 5, 2018, response to plaintiff's complaints about HSU ignoring his candida/systematic infection.  Neither response

demonstrated deliberate indifference. Plaintiff's April 27 letter raised general concerns about the HSU not helping him, and Richardson reasonably responded that as warden, he was not even allowed to access plaintiff's medical records, and that health care professionals were better equipped to address his specific concerns. Still, Richardson went on to assure plaintiff that he had shared his concerns with the HSU for their review.

Likewise, plaintiff's February 2018 letter did not raise any specific or severe deficiencies about his interactions with the HSU that would have been obvious to Warden Richardson, much less that HSU staff were ignoring plaintiff's need for medical treatment, nor that Richardson needed to take some sort of immediate corrective action beyond forwarding the concerns to HSM Barker. To the contrary, as Richardson explained in his letter, plaintiff had not even indicated that he had contacted HSM Barker about his concerns. As warden and a non-medical professional, therefore, it was patently reasonable for him to direct plaintiff to raise his concerns that HSU staff were ignoring his medical need to the manager of that unit. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay in their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.").

Certainly, had plaintiff's letter indicated that he attempted to raise his concerns directly with Barker and she completely ignored him, Richardson may have been obliged to take some additional investigatory actions. However, there is no evidence suggesting

that Richardson had a legitimate basis to believe that plaintiff's medical needs were being ignored, at any level within the HSU.  Accordingly, Richardson is entitled to summary judgment as well, and the court will grant defendants' motion in full.[5]

ORDER

IT IS ORDERED that:

(1)     Defendants' motion for summary judgment (dkt. #70) is GRANTED.

(2)     Plaintiff's motion to compel (dkt. #65) is DENIED as moot.

(3)     The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 2nd day of July, 2021.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

---

[5] For this reason, the court need not address defendants' alternative arguments for qualified immunity.